REVISED OCTOBER 17, 2001

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-10965
_____


SISSY LITTLEFIELD; ET AL

                                    Plaintiffs

SISSY LITTLEFIELD; DAVID LITTLEFIELD; JOEL ODOM; SUSAN
BECMER; NICHOLAS BECMER; ET AL

                          Plaintiffs - Appellants

        v.

FORNEY INDEPENDENT SCHOOL DISTRICT; KEITH BELL; KENNETH
CLEAVER; CLARENCE DOGGAN; JAY CALVIN; JIM JACOBS; RICK
TOWNSEND; DAVID WALKER; CHESTER J ST CLAIR

                          Defendants - Appellees

_____

Appeal from the United States District Court
for the Northern District of Texas
_____
September 26, 2001

Before KING, Chief Judge, BARKSDALE, Circuit Judge, and NOWLIN,
District Judge.[*]

KING, Chief Judge:

    Plaintiffs-Appellants, individual students and parents of

students in the Forney Independent School District, appeal the

district court's grant of summary judgment in favor of

_____

    [*]   Chief Judge of the Western District of Texas, sitting by
designation.

Defendants-Appellees Forney Independent School District, Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, David Walker, and Chester J. St. Clair.  For the following reasons, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs-Appellants[1] are students and parents of students who attend schools situated in the Forney Independent School District ("Forney") in Forney, Texas.  Plaintiffs-Appellants sued Defendants-Appellees asserting several constitutional challenges to the mandatory school uniform policy ("Uniform Policy" or "Policy") adopted by Forney.  Defendants-Appellees are Forney; Chester St. Clair, General Superintendent of Forney; and Keith Bell, Kenneth Cleaver, Clarence Doggan, Jay Calvin, Jim Jacobs, Rick Townsend, and David Walker, Members of the Forney Board of Trustees (collectively referred to hereinafter as "Defendants").

---

[1]   Plaintiffs-Appellants are Sissy Littlefield, David Littlefield, Joel Odom, Susan Becmer, Nicholas Becmer, Jonathan Becmer, Stan Bland, Glenda Bland, Jennifer Bland, Jeffery Bland, Steve Calvery, Greta Calvery, Ashley Calvery, Scott Ryan Calvery, Lenny McKinney, Opal McKinney, Beverly McKinney, Rebecca McKinney, Virginia McLaren, Natalie Johnson, Tom Napper, Brandi Napper, Kevin Napper, Chelsea Napper, Mary Penn, Haley Penn, Lynzi Anderson, Drew Anderson, William Tapley, Norma Tapley, Kaytie Elizabeth Tapley, Cindy Woods, Dustin Woods, Benjamin Woods, Chad Woods, Aaron Woods, Tammy Winner, Mark Winner, Ryan Winner, Daniel Ingram, Cliff Clipp, Kim Clipp, Michael Lamberth, Cash Clipp, Joe Don Law, Brad Law, David Lowery, Vinita Lowery, and Madeline Lowery.

In the spring of 1999, Forney, acting pursuant to Texas Education Code § 11.162[2] adopted a district-wide mandatory Uniform Policy applicable to its students. The Uniform Policy apparently originated as a result of the efforts of General Superintendent St. Clair, who observed the successful implementation of uniform policies employed in other Texas school districts. In addition to St. Clair, school board members and school officials conferred with their counterparts at other Texas public schools and reviewed studies on the efficacy of school uniform policies. As found by the district court,

> St. Clair came to the conclusion that the implementation of a school uniform program would, according to his research, have the following beneficial effects on the students and the system as a whole: improve student performance, instill

---

[2] Section 11.162 of the Texas Education Code provides in relevant part:

(a) The board of trustees of an independent school district may adopt rules that require students at a school in the district to wear school uniforms if the board determines that the requirement would improve the learning environment at the school.
(b) The rules the board of trustees adopts must designate a source of funding that shall be used in providing uniforms for students at the school who are educationally disadvantaged.
(c) A parent or guardian of a student assigned to attend a school at which students are required to wear school uniforms may choose for the student to be exempted from the requirement or to transfer to a school at which students are not required to wear uniforms and at which space is available if the parent or guardian provides a written statement that, as determined by the board of trustees, states a bona fide religious or philosophical objection to the requirement.

See TEX. EDUC. CODE ANN. § 11.162 (Vernon 1996).

3

> self-confidence, foster self-esteem, increase attendance,
> decrease disciplinary referrals, and lower drop-out rates.

See Littlefield v. Forney Indep. Sch. Dist., 108 F. Supp. 2d 681, 686 (N.D. Tex. 2000).  Forney also sought input from parents regarding the proposed Policy.  In March 1999, a "take-home" survey was sent home with elementary, middle, and junior-high school students in order to elicit parental approval of the proposed Uniform Policy.  The district court found that, of the thirty-four percent of parents who responded, approximately sixty percent of that group was in favor of mandatory uniforms.  Forney also conducted two "town hall" style meetings on the subject.  At these meetings, parents were provided the opportunity to comment on the proposed Uniform Policy.

As a result of this information, the Forney School Board made factual findings that the school uniforms would improve the learning environment at the schools, and on April 19, 1999, adopted the Uniform Policy now at issue.  The Uniform Policy applied to all 2,500 students in each of the schools within the district and was implemented at the beginning of the 1999-2000 school year.

The disputed Uniform Policy requires students to wear solid color polo-type shirts with collars, oxford-type shirts, or blouses with collars in one of four colors (white, yellow, red,

or navy blue).[3]  The shirts may be either short- or long-sleeved but must be tucked in at all times.  Students must also wear either blue or khaki colored pants, shorts, skirts, or jumpers. The shorts and skirts must be of appropriate size and length (no shorter than three inches above the knee).  The Policy prohibits the wearing of, inter alia, denim, leather, suede, or vinyl, or any clothing that suggests gang affiliation, could conceal contraband, or could create a distraction.  Certain other clothing items are also banned, such as open-heeled sandals, flip-flops, military boots, overalls, athletic pants, spandex, baggy clothing, and sleeveless shirts.  The Uniform Policy also regulates the sizes of manufacturer logos permitted on clothing. Prior to the adoption of the Policy, Forney had a dress code that prohibited certain types of clothing deemed unsafe, immodest, or otherwise inimical to the educational process.

Forney asserts that the Uniform Policy was adopted to promote school spirit and school values, and "to promote decorum (and thereby the notion that school is a place of order and work), to promote respect for authority, to decrease socioeconomic tensions, to increase attendance, and to reduce drop out rates."  Forney also asserts that it intended the Policy

---

[3]  There are slight differences between the mandatory uniform policies covering the primary and intermediate schools and the policy covering the secondary schools.  These differences, however, are not relevant to the disposition of this appeal.

"to increase student safety by reducing gang and drug related activity as well as the likelihood of students bringing weapons to school undetected and by allowing teachers to more readily distinguish Forney students from outsiders."

Failure to comply with the Uniform Policy results in disciplinary action, which could lead to expulsion. As stated in the Forney District-Wide Student Handbook, "if a non-exempt student attends school in violation of this uniform policy, the following disciplinary steps will be taken in order: [1] the student will be placed immediately in isolation on the campus, either until the parent can bring appropriate clothing or for the entire day, whichever comes first; [2] the student will be sent to BAM [Behavioral Adjustment Modification] for a minimum of 3 days for the second infraction; [3] if the student still refuses to comply, the student will remain in BAM for a maximum of two weeks; [4] if the student still refuses to comply following the two week BAM assignment, the principal will pursue due process for AEP [Alternative Education Program] or expulsion."

In compliance with the requirement of Texas Education Code § 11.162(c), the Uniform Policy includes an "opt-out" provision whereby parents and students with "bona fide" religious or philosophical objections to the wearing of a uniform can apply for an exemption to the Policy. The opt-out provision requires parents to request an Application for Exemption and fill out a questionnaire designed to gauge the sincerity of the beliefs of

6

those parents who assert objections.  This questionnaire asks whether the student has ever participated in any of a number of activities that would have required him or her to wear a uniform.[4]  Families granted exemptions from the Uniform Policy must reapply each school year.  A three-step grievance system was created to address issues arising from the opt-out procedure.[5]

The district court found that the parents of seventy-two students sought exemptions from compliance with the Uniform Policy, of which twelve exemptions were granted.[6]  A few of the Plaintiffs-Appellants were within the group of students who were granted exemptions from the Policy.  Most students who had based their objections on philosophical or religious grounds were

---

[4]  For example, the questionnaire asks if a student has ever worn a uniform to participate in activities such as girl scouts, boy scouts, non-school organized sports teams, school-sponsored sports teams, band, choir, drill team or whether a student has ever worn a uniform to work at a business, at church, or at a church-related activity.  In addition, the questionnaire asks whether the parents have ever participated in activities that might require a uniform.

[5]  Parents requesting an exemption from the Policy for their children are required to meet with a designated administrator to discuss the Policy and the nature of the objection.  These "Level I" hearings are conducted by the campus principal or an assistant principal.  Level I hearings may be appealed to a "Level II" hearing at the district level.  Level II hearings are to be conducted by Defendant St. Clair or a deputy administrator designated by him.  A final "Level III" hearing is available before the School Board Trustees.

[6]  Several of these opt-out exemptions were granted for medical reasons.

denied exemptions because they had worn some type of uniform in the past.

Several Plaintiffs-Appellants unsuccessfully sought exemption from the Uniform Policy through established administrative channels.  Other Plaintiffs-Appellants refused to respond to the questionnaire based on constitutional or personal objections.  Plaintiffs-Appellants then brought suit under 42 U.S.C. § 1983 seeking declaratory and injunctive relief and damages.

Relevant to this appeal, Plaintiffs-Appellants bring three separate, substantive constitutional challenges to the Uniform Policy.  First, the student-Plaintiffs-Appellants subject to the Uniform Policy assert that the compulsory wearing of uniforms violates the First Amendment because the wearing of uniforms is both a form of coerced speech, in that, it compels them to express ideas with which they may not agree, and, at the same time, it is an infringement on free expression, in that it prevents them from freely expressing particular messages they do wish to convey.  Second, the parent-Plaintiffs-Appellants claim that the compulsory Uniform Policy violates their "fundamental" right to control the upbringing and education of their children in violation of the Fourteenth Amendment.  Finally, four family-Plaintiffs-Appellants (parents seeking relief on behalf of their children), who sought exemption from the Uniform Policy on religious grounds, allege that the existing opt-out procedures

8

restrict their freedom to exercise their religious beliefs in violation of the Free Exercise Clause of the First Amendment because the opt-out questionnaire and hearing procedures impermissibly delve into the substance of their religious beliefs. Further, these four family-Plaintiffs-Appellants contend that the opt-out procedures favor certain established religions at the expense of other religions and thus violate the Establishment Clause of the First Amendment.

Defendants filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and moved for summary judgment based on qualified immunity. The district court treated the motion to dismiss as a motion for summary judgment and granted summary judgment in favor of Defendants, concluding that no constitutional violation occurred in this case. The district court did not reach the qualified immunity issue.

Plaintiffs timely appeal the grant of summary judgment.

## II. STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmovant. See Smith v. Brenoettsy, 158 F.3d 908, 911 (5th Cir. 1998); see also Tolson v. Avondale Indus., Inc., 141 F.3d 604, 608 (5th Cir. 1998). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

9

the moving party is entitled to judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). The moving party bears the burden of showing the district court that there is an absence of evidence to support the nonmoving party's case. See id. at 325. "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995). "A dispute over a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Smith, 158 F.3d at 911 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The substantive law determines which facts are material. See Anderson, 477 U.S. at 248.

### III. FIRST AMENDMENT EXPRESSIVE CONDUCT CLAIMS

The First Amendment protects not only verbal and written expression, but also symbols and conduct that constitute "symbolic speech." See Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 505-06 (1969). As the Supreme Court explained in Texas v. Johnson:

> While we have rejected the view that an apparently limitless variety of conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea, we have acknowledged that conduct may be sufficiently imbued

10

with elements of communication to fall within the scope of the First and Fourteenth Amendments.

491 U.S. 397, 404 (1989) (citations and internal quotations omitted).  In evaluating whether particular conduct possesses "sufficient communicative elements" to implicate First Amendment protections, courts must ask whether "[a]n intent to convey a particularized message was present, and . . . [whether] the likelihood was great that the message would be understood by those who viewed it."  Id. (alterations in original) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)).

The protection of the First Amendment depends not only on whether the conduct is expressive, but also on the context in which that expression takes place.  In the public school arena, the free expression rights of students are balanced by the corresponding interest of furthering the educational mission of schools.  Compare Tinker, 393 U.S. at 506 (recognizing that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"), with Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) ("A school need not tolerate student speech that is inconsistent with its basic educational mission, even though the government could not censor similar speech outside the school." (citations and internal quotations omitted)), and Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 682 (1986) (recognizing that the First Amendment rights of public school students "are not automatically

11

coextensive with the rights of adults in other settings"). Public schools, therefore, while responsible for inculcating the values of the First Amendment necessary for citizenship, are not themselves unbounded forums for practicing those freedoms.

The student-Plaintiffs-Appellants (referred to in this section as the "Students") raise two separate free expression arguments based on the First Amendment.[7] The Students claim that the Uniform Policy acts as a form of "coerced speech" in that it forces the Students to convey a state-approved message that

_____

[7] The district court found that the Plaintiffs-Appellants had established the requisite Article III injury to challenge the Uniform Policy. The district court stated:

> [T]he Forney I.S.D. Student Uniform Policy specifically provides that if a student persists in his refusal to comply with the uniform policy, his ultimate sanction is the alternative education program or expulsion. Thus, it is apparent that the penalty of expulsion from school may be imposed on those students who, for whatever reason, refuse to wear the prescribed uniform. Moreover, Plaintiffs seek remedies, including damages, for injuries which have already occurred. Accordingly, the Court concludes that Plaintiffs have established a particularized, imminent or actual injury, for purposes of Article III.

See Littlefield, 108 F. Supp. 2d at 688. We agree. Students and parents may challenge unconstitutional actions in the public schools that directly affect the students. See e.g., Sch. Dist. of Abington Township v. Schempp, 374 U.S. 203, 224 (1963) ("The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain."). Of course, as will be discussed infra in the text, each subset of the Plaintiffs-Appellants ("Students," "Parents," and the four families with religious objections) has standing only to challenge the particular legal claim for which that subset can demonstrate injury, causation, and redressability.

12

students do not wish to send,[8] see Wooley v. Maynard, 430 U.S. 705, 714 (1977); West Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 633 (1943), and that the Uniform Policy acts as a "prior restraint" by preventing the Students from freely expressing any message at all through their attire (other than the state-approved message).[9]  See United States v. O'Brien, 391 U.S. 367, 376 (1968).

Defendants argue that the choice of student clothing is not expressive conduct protected by the First Amendment, and thus, any rational regulation[10] of such nonexpressive conduct should

---

[8]  Regarding the "coerced speech" argument, the Students argue that mandatory uniforms convey a particularized message that the school district wishes to express, namely that students have respect for the authority of teachers and administrators, have Forney school and civic pride, and support the school policies.  The Students argue that this message is also understood by school officials, students, and the public, which is the exact reason why the Uniform Policy was adopted (or else it would have no rational purpose).  The Students also adduced evidence from student depositions that these students did not wish to convey the message intended by Forney.  Thus, the Students conclude that mandatory uniforms coerce students to convey a particular message, which Forney wishes them to express, but which they oppose.

[9]  As to the "prior restraint" argument, the Students argue that because the Uniform Policy precludes the use of clothing to express any message — no matter how specific or particularized — and that school children do wear clothing that sends political, cultural, and social messages, this restriction is a content-based prior restraint on speech.

[10]  Defendants contend that this court should review the Uniform Policy under rational-basis scrutiny.  Under this standard, courts look for a rational relationship between the regulation and a conceivable governmental interest.  See FM Prop. Operating Co. v. City of Austin, 93 F.3d 167, 174-75 (5th Cir. 1996).

13

survive constitutional scrutiny.  Defendants also contend that the wearing of school uniforms does not convey a sufficiently particularized message to be considered coerced speech, see Spence v. Washington, 418 U.S. 405, 409 (1974), and thus cannot be considered a prior restraint on expression prohibited by the First Amendment.[11]  See Karr v. Schmidt, 460 F.2d 609, 613-14 (5th Cir. 1972) (en banc).[12]

The threshold question, then, is whether the expression at issue is entitled to protection under the First Amendment.  The district court agreed with Defendants and held that the mandatory Uniform Policy did not implicate "expressive conduct" protected by the First Amendment.  See Littlefield, 108 F. Supp. 2d at 694 (relying on Spence, 418 U.S. at 409, and Karr, 460 F.2d at 613-14, to find student clothing not to be protected expression under the First Amendment).  However, subsequent to the district court's issuance of its opinion, this court, in Canady v. Bossier

---

[11]  Defendants argue that the First Amendment only protects particularized expression and that the only particularized message that the Students wish to convey by wearing non-uniform clothes is "individuality," but that individuality, almost by definition, is not sufficiently particularized to be protected by the First Amendment.  Further, Defendants argue that there is no evidence that other people at school would be likely to understand the students' message of "individuality."

[12]  In Karr, this court rejected a constitutional challenge to a portion of a public school dress code that regulated the length of hair for boys.  See 460 F.2d at 613-14.  The court determined that the decision to wear long hair is not expressive activity protected by the First Amendment.  See id. at 614 ("[W]e think it inappropriate that the protection of the First Amendment be extended to the wearing of long hair.").

14

Parish School Board, explicitly addressed the First Amendment implications of a mandatory school uniform policy and cast doubt on the district court's reasoning. See 240 F.3d 437, 440 (5th Cir. 2001) (disagreeing with the district court in Littlefield that the rationale in Karr could be applied to students' choice of attire).

In Canady, this court resolved a First Amendment challenge to a mandatory school uniform policy adopted by the Bossier Parish School Board in Bossier Parish, Louisiana. The Bossier uniform policy involved a similar requirement of one of several colors of collared shirts and a similar choice between blue or khaki pants. In addressing the threshold question of expression, this court assumed without deciding that "an individual's choice of attire . . . may be endowed with sufficient levels of intentional expression to elicit First Amendment shelter." Id. Faced with an almost identical First Amendment challenge to a uniform policy, this court reasoned:

> A person's choice of clothing is infused with intentional expression on many levels. In some instances, clothing functions as pure speech. A student may choose to wear shirts or jackets with written messages supporting political candidates or important social issues. Words printed on clothing qualify as pure speech and are protected under the First Amendment. . . . Clothing may also symbolize ethnic heritage, religious beliefs, and political and social views. Individuals regularly use their clothing to express ideas and opinions. . . . The choice to wear clothing as a symbol of an opinion or cause is undoubtedly protected under the First Amendment if the message is likely to be understood by those intended to view it. . . . Finally, students in particular often choose their attire with the intent to signify the social group to which they belong, their

15

participation in different activities, and their general attitudes toward society and the school environment. While the message students intend to communicate about their identity and interests may be of little value to some adults, it has a considerable [e]ffect, whether positive or negative, on a young person's social development.

Id. at 440-41 (citations omitted). The Canady court then went on to state that while "this sort of expression may not convey a particularized message to warrant First Amendment protection in every instance, we cannot declare that expression of one's identity and affiliation to unique social groups through choice of clothing will never amount to protected speech." Id. at 441.[13] Assuming the First Amendment applies to the students' choice of expression, the court then applied the First Amendment framework of United States v. O'Brien, 391 U.S. 367, 377 (1968), relating to content-neutral restrictions on expressive activities, to hold that the Bossier Parish mandatory school uniform policy did not violate the First Amendment.

---

[13] The court further qualified its conclusion:

We do not conclude that every choice of clothing expresses a particularized message, and we make no judgment as to the extent or type of clothing necessary to communicate a discrete message in order to afford First Amendment protection. Our analysis simply acknowledges that certain choices of clothing may have sufficient communicative content to qualify as First Amendment activity.

Canady, 240 F.3d at 441 n.3.

16

For the purposes of this opinion, we follow the reasoning of the Canady court[14] and again, assume without deciding, that the First Amendment applies to the expressive conduct implicated in the mandatory Uniform Policy.  However, applying the O'Brien test, we hold that the Uniform Policy does not violate the First Amendment.

In O'Brien, the Supreme Court created an analytical framework to evaluate content-neutral restrictions on expressive activities.  The Court held that "when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms."  391 U.S. at 376.  Applying O'Brien to the challenged governmental policy at issue, the Uniform Policy will

_____

[14]  At issue in Canady was only a "prior restraint"-type argument.  However, the assumption that student clothing, and thus the Uniform Policy, implicates expressive conduct also applies to the "coerced speech" challenge.  In fact, as discussed infra in the text, the requirement that all students wear a certain type of uniform in order to further a certain particularized message of the school district is arguably a stronger justification to find potential expressive conduct and, thus, to apply Canady and O'Brien.  The Students have set forth affidavits from Forney officials that the Uniform Policy was intended to express a particular institutional image.  In deposition testimony, Forney school officials stated that the purpose of the uniform was, inter alia, to convey respect for "the values of the Forney schools" and the "City of Forney." Thus, because Forney implemented the Uniform Policy with the intention of conveying that message, we find it permissible to assume that the expression involved was intentional and particularized and, thus, follow the logic of Canady in evaluating the coerced speech claim.  As in Canady, however, we need not and do not decide the issue.

17

survive constitutional scrutiny if (1) it is within the constitutional power of the government, (2) it furthers an important or substantial governmental interest, (3) the interest is unrelated to the suppression of student expression, and (4) the incidental restrictions on First Amendment activities are no more than is necessary to facilitate that interest. See id. at 377. The O'Brien standard is applicable to both the Students' "coerced speech" arguments, see Wooley v. Maynard, 430 U.S. 705, 716 (1977), and their "prior restraint"/"free expression" arguments. See Canady, 430 F.3d at 443.

We have little difficulty in concluding that the Uniform Policy passes constitutional scrutiny under the O'Brien standard. First, there is no question that, pursuant to state law, Defendants have the power to pass a mandatory school uniform policy. See TEX. EDUC. CODE ANN. § 11.162 (Vernon 1996).[15]

Second, improving the educational process is undoubtably an important and substantial interest of Forney and the school board. See Canady, 240 F.3d at 443; see also Kuhlmeier, 484 U.S. at 271-72. The Uniform Policy was adopted to improve student performance, instill self-confidence, foster self-esteem, increase attendance, decrease disciplinary referrals, and lower drop-out rates. See Littlefield, 108 F. Supp. 2d at 686. Such interests in the health, safety, and order of public schools are

---

[15] Plaintiffs-Appellants concede that § 11.162 of the Texas Education Code is constitutional.

18

sufficient government interests under O'Brien. While the Students argue that Defendants have failed to produce evidence of any need to further these improvements in Forney, we are satisfied that, on this record, Defendants have established the requisite connection between the Uniform Policy and the stated interests in improving Forney schools.[16] As has been well recognized, federal courts should defer to school boards to decide, within constitutional bounds, what constitutes appropriate behavior and dress in public schools. See Canady, 240 F.3d at 441, 444 ("[I]t is not the job of federal courts to determine the most effective way to educate our nation's youth."); see also Fraser, 478 U.S. at 683.

Third, the Students have not established issues of material fact sufficient to demonstrate that the Defendants' interest in enacting the Uniform Policy was to suppress expression. See O'Brien, 391 U.S. at 377. The record demonstrates that the Uniform Policy was adopted for other legitimate reasons unrelated to the suppression of student expression. For example, Forney asserts that the Policy was implemented to increase safety by providing a means to differentiate Forney students from

---

[16] The Forney School Board Policy included findings by the Board that the requirement of wearing school uniforms would improve the learning environment in the district. In addition, school officials evaluated uniform policies in other school districts. This evaluation was made in an attempt to find solutions to improve student performance and further the interests discussed in the text.

19

nonstudents who might enter Forney campuses.  In addition, the Uniform Policy was intended to decrease socioeconomic disparities and tensions between students, increase attendance (because truants would be easily identified), and reduce gang and drug-related activity, as well as the likelihood of students bringing weapons to school undetected.[17]  Following Canady, we hold that Forney's purpose in enacting the Uniform Policy cannot be deemed an attempt to suppress or coerce speech.  Cf. Canady, 240 F.3d at 443 ("The School Board's purpose for enacting the uniform policy is to increase test scores and reduce disciplinary problems throughout the school system.  This purpose is in no way related to the suppression of student speech.").

Finally, we are satisfied that, because of the limited nature of the restriction, "the incidental restrictions on First Amendment activities are no more than is necessary to facilitate [Forney's] interest."  O'Brien, 391 U.S. at 377.  The restrictions pertain only to student attire during school hours and do not affect other means of communication.  Again, following Canady,

> Although students are restricted from wearing clothing of their choice at school, students remain free to wear what they want after school hours.  Students may still express

_____

[17]  In fact, Forney has submitted evidence that three out of the four campuses had an increase in attendance and a decline in non-dress code disciplinary referrals.  Further, in three instances, four nonstudents on campus were intercepted and asked to leave the school grounds, in part, because they were identifiable as non-Forney students.

20

> their views through other mediums during the school day.
> The uniform requirement does not bar the important "personal
> intercommunication among students" necessary to an effective
> educational process.

Id. at 443 (quoting Tinker, 393 U.S. at 512).  Thus, we hold that

the Uniform Policy survives First Amendment scrutiny under the

O'Brien test and, because there are no genuine issues of material

fact regarding the application of the O'Brien test, we affirm the

judgment of the district court.

### IV. PARENTAL RIGHTS UNDER THE FOURTEENTH AMENDMENT

The Fourteenth Amendment prohibits States from depriving

persons "of life, liberty, or property, without due process of

law."  See U.S. CONST. amend. XIV, § 1.  As the Supreme Court

recently reaffirmed: "We have long recognized that the

Amendment's Due Process Clause, like its Fifth Amendment

counterpart, 'guarantees more than fair process.'  The Clause

also includes a substantive component that 'provides heightened

protection against government interference with certain

fundamental rights and liberty interests.'"  Troxel v. Granville,

530 U.S. 57, 65 (2000) (plurality opinion) (quoting Washington v.

Glucksberg, 521 U.S. 702, 719, 720 (1997)).

One of "the fundamental liberty interests" recognized by the

Court is the "interest of parents in the care, custody, and

control of their children."  See id., at 65-66 ("[I]t cannot now

be doubted that the Due Process Clause of the Fourteenth

Amendment protects the fundamental right of parents to make

21

decisions concerning the care, custody, and control of their children."); see also Meyer v. Nebraska, 262 U.S. 390, 401 (1923) (recognizing that the liberty interest protected by due process includes the right of parents "to control the education of their own"); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534-35 (1925) (recognizing that "the liberty of parents and guardians" includes the right "to direct the upbringing and education of children under their control"); Prince v. Massachusetts, 321 U.S. 158, 166 (1944) (recognizing that there is a constitutional interest in parents directing the "custody, care and nurture of the child").

The parent-Plaintiffs-Appellants (referred to in this section as the "Parents") argue that their right to control their children's education is a fundamental right entitled to heightened constitutional protection. Specifically, the Parents claim that the mandatory school uniforms interfere with their parental rights to teach their children to be guided by one's own conscience in making decisions, to understand the importance of appropriate grooming and attire, to understand the importance of one's own individuality, and to respect the individuality of others. The Parents argue that the implementation of mandatory uniforms presumes that parents are either incapable or unwilling to act in the best interests of their children. Because the Parents assert that this right of "control" has been recognized as "fundamental," see Troxel, 530 U.S. at 65, the Parents contend

22

that a "strict-scrutiny"[18] level of analysis must be applied to the Uniform Policy.

Defendants argue, in contrast, that while parents may have a fundamental liberty interest in their children's upbringing, this interest cannot usurp the state's role in determining appropriate behavior at public schools, including the role of determining appropriate dress codes in the district. Defendants argue that notwithstanding the Supreme Court's recent reaffirmation of parental rights as fundamental rights in Troxel, that decision does not in any way extend parents' rights to frustrate basic school rules reasonably required to regulate the educational system. Defendants argue, therefore, that a rational-relationship/rational-basis[19] test is the appropriate standard to judge the school Uniform Policy at issue.

The district court agreed with Defendants and applied a rational-basis test, concluding that Forney's Uniform Policy did not infringe the Parents' fundamental right to control the

---

[18] The Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny and will be upheld only when they are narrowly tailored to a compelling governmental interest. See Reno v. Flores, 507 U.S. 292, 302 (1993) (reaffirming that due process "forbids the government to infringe certain 'fundamental' liberty interests at all, . . . unless the infringement is narrowly tailored to serve a compelling state interest").

[19] See supra note 10.

23

rearing and education of their children.  See Littlefield, 108 F. Supp. 2d at 703.  The district court rejected the Parents' argument that the Supreme Court's determination in Troxel — that the Due Process Clause protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children — could be read to cover complaints about a school Uniform Policy.  See id. at 702 ("The fundamental right of filiation and companionship with one's children, which the Supreme Court examined in Troxel, is an entirely different balance of interests from the right of parents to send their children to a public school in clothes of their own choosing.").  We agree with the impressively reasoned decision of the district court on this issue.

In Troxel, the Court struck down a Washington State statute that allowed "any person," including a grandparent, to petition for visitation rights at any time, if it was in the best interests of the child.  See 530 U.S. at 63.  The Court found the statute offensive to the parental rights of the mother in that it unconstitutionally interfered with the mother's right to make decisions concerning the upbringing of her child.  See id. at 69-70.  While the Supreme Court in Troxel recognized that there exists a fundamental right of parents to direct their children's upbringing, it failed to articulate a standard of judicial

24

scrutiny to be applied.[20]  See id. at 80 (Thomas, J., concurring) ("The opinions of the plurality, Justice Kennedy, and Justice Souter recognize such a right, but curiously none of them articulates the appropriate standard of review.")).

The dispositive question at issue is whether the sweeping statements of the plurality opinion in Troxel regarding the "fundamental" "interest of parents in the care, custody, and control of their children," see id. at 65, mandate a strict standard of scrutiny for the Parents' Fourteenth Amendment challenge to the Uniform Policy.  We do not read Troxel to create a fundamental right for parents to control the clothing their children wear to public schools and, thus, instead follow almost eighty years of precedent analyzing parental rights in the context of public education under a rational-basis standard.

Before the Supreme Court's Troxel opinion, the Court had addressed the issue of parental rights in public schools in three major opinions.  First, in Meyer v. Nebraska, the Court held unconstitutional a law that forbade schools from teaching foreign

_____

[20]  The Court also failed to reach agreement on the parameters of the right at issue.  See Troxel, 530 U.S. at 78 (Souter, J., concurring) ("Our cases . . . have not set out exact metes and bounds to the protected interest of a parent in the relationship with his child."); see id. at 95 (Kennedy, J., dissenting) ("The principle [that the Fourteenth Amendment protects parental rights] exists, then, in broad formulation; yet courts must use considerable restraint, including careful adherence to the incremental instruction given by the precise facts of particular cases, as they seek to give further and more precise definition to the right.").

25

languages to students below the eighth grade, applying the equivalent of a rational-basis review.[21]  See 262 U.S. 390, 396-97, 403 (1923) ("We are constrained to conclude that the statute as applied is arbitrary, and without reasonable relation to any end within the competency of the state." (emphasis added)).  The Supreme Court held that the Fourteenth Amendment protects the right "to marry, establish a home, and bring up children."  Id. at 399.

Two years later, in Pierce v. Society of Sisters, the Court struck down a state law prohibiting parents from sending their children to private school, again utilizing the equivalent of a rational-basis test.  See 268 U.S. 510, 530-31 (1925).  The Court invalidated the statute because it "unreasonably interfer[ed] with the liberty of parents and guardians to direct the upbringing and education of children under their control."  Id. at 534-35 (emphasis added).

Finally, in Wisconsin v. Yoder, members of the Old Order Amish religion and the Conservative Amish Mennonite Church argued that mandatory school attendance beyond the eighth grade violated their rights under the Fourteenth Amendment and under the First Amendment's Free Exercise Clause.  See 406 U.S. 205, 207 (1972).  The Supreme Court agreed that, as it applied to the Amish, the

---

[21]  We use the term "equivalent" because both Meyer and Pierce were decided before the Supreme Court adopted its tiered-scrutiny method of analysis.

26

state law was unconstitutional.  See id. at 234.  Yoder was decided based on the Free Exercise Clause, but it informs the discussion about the balancing of interests regarding parental rights implicated under the Fourteenth Amendment.  The Court acknowledged both the state interest in providing and regulating a state public education system and the parental interest in controlling a child's religious upbringing and education.  See id. at 213-14.  As the district court in this case reasoned:

> Understanding the full import of Yoder, which refined the parental rights announced in Meyer and Pierce, is critical to properly analyze the claims presented in the present case.  In Yoder, the Supreme Court, while reaffirming the general notion that parental rights are a protected liberty interest under the due process clause, recognized the "high responsibility" and regulatory power of the state in matters of public education.  Furthermore, while fundamental religious practices may excuse parents from complying with educational policies, secular objections to such policies are insufficient to avoid compliance.

Littlefield, 108 F. Supp. 2d at 699 (emphasis added).  The Yoder Court went on to state that "[a] way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations."  Yoder, 406 U.S. at 215 (emphasis added).[22]

_____

[22]  In striking down the statute as applied to the Amish, the Supreme Court applied a stricter standard than rational basis review because the parental interests were combined with free exercise interests.  See Yoder, 406 U.S. at 233 ("[W]hen the interests of parenthood are combined with a free exercise claim of the nature revealed by this record, more than merely a reasonable relation to some purpose within the competency of the State is required to sustain the validity of the State's requirement under the First Amendment." (citations and internal quotations omitted)).

27

Thus, as the district court recognized: "[w]hile the Court employed more than a rational basis standard with reference to the First Amendment free exercise clause, it is clear that the due process interest of parents to direct the upbringing and education of their children, standing alone, warranted no more than rational-basis review." Littlefield, 108 F. Supp. 2d at 699. As such, the district court concluded that Meyer, Pierce, and Yoder, taken together, support the argument that a rational-basis review is the appropriate standard in this case. This conclusion is in accord with other circuit courts of appeals that have addressed the issue, pre-Troxel. See Herndon v. Chapel Hill — Carrboro City Bd. of Educ., 89 F.3d 174, 177-79 (4th Cir. 1996); Immediato v. Rye Neck Sch. Dist., 73 F.3d 454, 461 (2d Cir. 1996).

Troxel does not change the above reasoning in the context of parental rights concerning public education. While Parents may have a fundamental right in the upbringing and education of their children, this right does not cover the Parents' objection to a public school Uniform Policy. It has long been recognized that parental rights are not absolute in the public school context and can be subject to reasonable regulation. See, e.g., Runyon v. McCrary, 427 U.S. 160, 177 (1976) (recognizing no parental right to educate children in private segregated academies); Kite v. Marshall, 661 F.2d 1027, 1029 (5th Cir. 1981); see also Swanson v. Guthrie Indep. Sch. Dist., 135 F.3d 694, 698 (10th Cir. 1998)

28

(recognizing that cases in this area establish that "parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject"); Brown v. Hot, Sexy & Safer Prods., Inc., 68 F.3d 525, 533 (1st Cir. 1995); Fleischfresser v. Dir. of Sch. Dist. 200, 15 F.3d 680, 690 (7th Cir. 1994); Murphy v. Arkansas, 852 F.2d 1039, 1044 (8th Cir. 1988); Fellowship Baptist Church v. Benton, 815 F.2d 485, 491 (8th Cir. 1987).  These cases support the determinations in Meyer, Pierce, and Yoder that a rational-basis test is the appropriate level of scrutiny for parental rights in the public school context.

Applying the rational-basis test, we conclude that the Uniform Policy is rationally related to the state's interest in fostering the education of its children and furthering the legitimate goals of improving student safety, decreasing socioeconomic tensions, increasing attendance, and reducing drop-out rates.  Therefore, we affirm the district court's summary judgment determination that the Uniform Policy does not violate the Parents' Fourteenth Amendment rights.

**V. FREE EXERCISE CLAUSE AND ESTABLISHMENT CLAUSE CLAIMS**

We find no merit in the family-Plaintiffs-Appellants' (referred to in this section as the "Families") claims under the Free Exercise and the Establishment Clauses of the First

29

Amendment.[23]  On appeal, the Families do not challenge the constitutionality of Texas Education Code § 11.162(c),[24] focusing instead on the application of the "opt-out" procedures by the Defendants (hereinafter referred to as the "opt-out policy"). The district court properly dismissed these First Amendment challenges in its well-reasoned opinion.  See Littlefield, 108 F. Supp. 2d at 703-08.  We agree with the district court that the Forney opt-out policy neither infringes on the families' free exercise of religion nor violates the Establishment Clause.

## A. Free Exercise Claim[25]

---

[23]  Only four families (parents and children) have Article III standing to bring the Free Exercise and Establishment Clause claims, see supra note 7, because only these four families sought exemption from the Uniform Policy on religious grounds.  These families are:  Virginia McLaren and her daughter Natalie Johnson (the "McLaren/Johnson" family), Mary Penn and her children Lynzi and Drew Anderson (the "Penn/Anderson" family), William and Norma Tapley and their daughter Kaytie Tapley (the "Tapleys"), and David and Vinita Lowery and their daughter Madeline Lowery (the "Lowerys") (collectively the "Families").  As the standing analysis for the Free Exercise Claim and the Establishment Clause Claim differ, we address the standing inquiry for each claim at the outset of each analytical section.  See infra notes 25 & 31.

[24]  See supra note 2.

[25]  To have Article III standing to pursue an alleged violation of the Free Exercise Clause, a plaintiff must allege that his or her own "particular religious freedoms are infringed."  Sch. Dist. of Abington v. Schempp, 374 U.S. 204, 224 n.9 (1963); Altman v. Bedford Cent. Sch. Dist., 245 F.3d 49, 71 (2d Cir. 2001); see also Fleischfresser, 15 F.3d at 684 (recognizing standing because "[o]ne aspect of the religious freedom of parents is the right to control the religious upbringing and training of their minor children").  Each family has alleged that the opt-out policy, by requiring them to explain, defend, and conform their religious practices in an effort not to have their children disciplined or expelled from

30

The Free Exercise Clause of the First Amendment, which has been made applicable to the states by incorporation into the Fourteenth Amendment[26] provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. CONST. amend. I.  In Employment Division, Department of Human Resources v. Smith, the Supreme Court held that a neutral, generally applicable governmental regulation will withstand a free exercise challenge when the regulation is reasonably related to a legitimate state interest.  See 494 U.S. 872, 879 (1990); Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993) ("In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.").

---

school, thereby infringes on their right to freely exercise their religious beliefs.  Due to the opt-out policy, the McLaren/Johnson family removed Natalie from the Forney school district, rather than be subject to what they allege was a violation of their First Amendment rights.  The Penn/Anderson family and the Tapleys refused to participate in the opt-out questionnaire, claiming that the procedures themselves were violative of their religious freedom.  The Lowerys were granted a religious exemption, but because the policy requires them to re-apply every year, they claim that the policy threatens a future injury.

[26]  See Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).

On its face, the opt-out policy enacted by Forney is neutral and of general application, in that it applies to all persons who might wish to attend Forney and choose to opt-out of the Uniform Policy.  All parties also agree that the opt-out policy was not enacted to inhibit religion and, in fact, recognize that the statutory provision was enacted to protect the reasonable state interest of fostering the free exercise of religion.  As a threshold matter, then, the opt-out policy survives constitutional scrutiny under <u>Smith</u>.

The Families' specific complaint, however, is that in the process of legitimately inquiring about the religious beliefs of families seeking exemption from the Uniform Policy, Defendants have "crossed the line between the legitimate inquiry into the sincerity of Plaintiffs' religious beliefs and prohibited inquiry into the substance of those beliefs."  The Families argue that, because there was no established school policy for determining who would be granted an exception, Defendants have become arbiters of the substance of religions in a manner that infringes the Families' free exercise of their beliefs.[27]

---

[27]  The Families have abandoned allegations of a "hybrid-rights" challenge to the opt-out policy.  The "hybrid-rights" argument is based on the Supreme Court's language in <u>Smith</u>, which recognized that a heightened standard of review may be required when a Free Exercise Clause claim is combined with another constitutional protection such as free expression or parental rights.  <u>See</u> <u>Smith</u>, 494 U.S. at 881 ("The only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action have involved not the Free Exercise Clause alone, but the Free

32

The difficulty for the Families is twofold.  First, the Families concede that it is permissible for Forney to examine the "sincerity" of their beliefs.  Second, on this record there exists an established district policy that Defendants have followed in a consistent manner.  We address these issues together.

Section 11.162(c) of the Texas Education Code provides that parents may exempt their children from the Uniform Policy if they can provide a bona fide religious or philosophical objection to the wearing of the uniform.[28]  In an effort to provide an objective means of determining the sincerity of the "bona fides" of a religious belief, Forney established a process of requiring written objection, the completion of a questionnaire that requests information regarding whether students had worn uniforms in the past, and personal meetings with the parents.[29]  This process to determine the sincerity of a religious objection, while fraught with difficulty, is necessary to separate sincere

_____

Exercise Clause in conjunction with other constitutional protections.").  The district court rejected the argument.  We do not address it.

[28]  See supra note 2.

[29]  Contrary to the Families' claims, the Forney opt-out policy was not solely dependant on parents' responses to the questionnaire.  For example, the Lowerys initially refused to fill out the questionnaire.  On appeal to the Board of Trustees, however, the Lowerys were granted an exemption based on their stated belief that their Native American ancestry combined with their Catholic beliefs deriving from their interpretation of the "Vatican II" proscribed the wearing of uniforms.

beliefs from fraudulent beliefs.  See Patrick v. LeFevre, 745

F.2d 153, 157 (2d Cir. 1984) ("Sincerity analysis seeks to

determine an adherent's good faith in the expression of his

religious belief.  This test provides a rational means of

differentiating between those beliefs that are held as a matter

of conscience and those that are animated by motives of deception

and fraud." (citations omitted)); see also Hernandez v.

Commissioner, 490 U.S. 680, 696-97 (1989); United States v. Daly,

756 F.2d 1076, 1081 (5th Cir. 1985) ("Although courts may not

determine whether a given belief is or is not a religion, the

trier of fact may determine whether a belief is truly held

without violating the First Amendment." (citations omitted)).

Because the opt-out procedures are a neutral and rational

means to determine sincerity, as a legal matter under Smith, they

do not interfere with the free exercise of religion.  See 494

U.S. at 877.  Further, in practice, "opt-outs" have been granted

to parents who have demonstrated a sincere and consistent

objection to the wearing of uniforms.[30]  Therefore, we conclude

---

[30]  For example, Mr. and Mrs. J.M. stated in response to an opt-out request for Judy M., a Forney student, that Mr. M.'s "negative personal experience" with uniforms in Catholic school created a sincere belief that Judy M. should not wear a uniform. Further, they answered "no" to all relevant questions regarding their child's previous wearing of uniforms.  The exemption was granted for Judy M.  In similar fashion, Mr. O., father of a Forney student Patrick O., indicated that he had pulled his children out of Catholic school, partly because of his objections to uniforms.  Mr. O. also responded to the questionnaire with "no" to each item.  Again, the exemption was granted.  In addition, the Lowerys were granted an exemption based on their

34

that the Families have not created a genuine issue of material fact that the application of Forney's opt-out policy violates their free exercise rights under the First Amendment.

B. Establishment Clause Claim[31]

The Families' Establishment Clause argument is equally without merit.  The Families assert that Defendants will grant exemption requests only upon proof that the applicant strictly adhered to an organized religion, thus manifesting a preference for only those religions in which adherents could provide written

---

religious beliefs that combine their Native American ancestry and their Catholic beliefs based on an interpretation of Vatican II.

[31]  "[T]he concept of injury for standing purposes is particularly elusive in Establishment Clause cases."  Murray v. City of Austin, 947 F.2d 147, 151 (5th Cir. 1991).  As the Court of Appeals for the Fourth Circuit recognized:

> [T]he standing inquiry in Establishment Clause cases has been tailored to reflect the kind of injuries Establishment Clause plaintiffs are likely to suffer. . . . [T]he spiritual, value-laden beliefs of the plaintiffs are often most directly affected by an alleged establishment of religion.  Accordingly, rules of standing recognize that noneconomic or intangible injury may suffice to make an Establishment Clause claim justiciable.

Suhre v. Haywood County, 131 F.3d 1083, 1086 (4th Cir. 1997) (citations omitted); see also Altman, 245 F.3d at 72 ("[S]tanding to assert an Establishment Clause claim may rest . . . on the plaintiff's direct exposure to the challenged activity."); Murray, 947 F.2d at 151-52.  In the instant case, the Families have alleged that the application of the opt-out policy appears to favor certain organized religions to which the Families do not belong.  This direct exposure to the policy satisfies the "intangible injury" requirement to bring an Establishment Clause challenge.

proof of the tenets of their beliefs.[32]  The Families argue that, in granting exemptions only to religions for which a prohibition on uniforms was clearly stated in the tenets of that religion, Defendants were establishing some religions as favored over others, in violation of the Establishment Clause.

To withstand an Establishment Clause challenge, a statute must have a secular legislative purpose, the statute's primary purpose must neither advance nor inhibit religion, and the statute must not foster an excessive entanglement with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-13 (1971).  As the district court found:

> [T]he uniform policy unquestionably has a secular purpose. Next, the principal effect neither advances nor inhibits religion.  Its purpose is to enhance the learning environment in the Forney schools, irrespective of the religious faith of a particular student.  Finally, the policy does not unnecessarily entangle the School Board with religion.  The uniform policy references religion only in the context of exemptions.  There is no evidence to suggest that as a result of the uniform policy, the School Board must routinely or even occasionally become involved in religious matters.  Less than one hundred exemption requests, out of nearly 2,500 students, were considered by the School Board, and the vast majority concerned secular opt-out requests.

Littlefield, 108 F. Supp. 2d at 708.  We agree with the district court's conclusion.  None of the families raising the Establishment Clause challenge can point to any religious purpose behind the implementation of the opt-out policy.  Nor can these

---

[32]  The Families posit the Amish and followers of Islam as examples of religious believers who could point to written tenets to support their opt-out claims.

families point to any "primary effect" of the opt-out policy that advances a particular religion or that inhibits a religion. On this record, it appears that those families that could demonstrate sincere and consistent rejection of mandatory uniforms were granted exemptions regardless of the particular tenets of their faith.[33] Finally, we do not perceive an intolerable risk of excessive government entanglement in the requirement that parents demonstrate their consistency and sincerity by explaining the basis of their religious objections to Defendants. We therefore affirm the district court's grant of summary judgment on these claims.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court in favor of Defendants.

---

[33] See supra note 30.

RHESA HAWKINS BARKSDALE, Circuit Judge, specially concurring:

I concur in the result and in all but part III. ("First Amendment Expressive Conduct Claims") of the majority opinion.

## I.

Concerning part III., our court utilizes assumptions regarding the claims of coerced-speech and restraint on free expression, rather than directly addressing those claims. By doing so, we simply invite, if not encourage, needless, repetitive litigation.

## II.

The wearing of the uniform at issue is not "expression" for First Amendment purposes. Accordingly, there is no coerced speech. Likewise, for the restraint-on-free-expression claim, and on this record, the requisite expression has not been demonstrated.

### A.

I regret we have not confronted the issue our court avoided in *Canady v. Bossier Parish Sch. Bd.,* 240 F.3d 437 (5th Cir. 2001): whether the wearing of a school uniform devoid of any logo, symbol, or motto is "expression" for First Amendment purposes. The answer to that question would resolve directly the coerced-speech claim at issue. Obviously, if that which is coerced is not speech, then speech has not been coerced.

#### 1.

The majority correctly acknowledges, as did our court in *Canady*, that the two-part test from *Spence v. Washington*, 418 U.S. 405, 410-11 (1974), is the correct analysis for discerning whether

conduct — such as the wearing of a school uniform — is sufficiently expressive to merit First Amendment protection. *Canady* explains the application of that test:

> "In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we [must] ask[] whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" When assessing the appellants' claim, we look to the particular activity, combined with the factual context and environment in which it was undertaken.

240 F.3d at 440 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989))(alteration in original)(citations omitted). Unfortunately, the majority, as did the *Canady* court, fails to adequately apply *Spence* to determine whether a school uniform specifically, as opposed to clothing generally, can constitute expression. Instead, as was done in *Canady*, the majority *assumes* for purposes of this appeal that the wearing of the uniform at issue constitutes expressive conduct.

Appellants (collectively, Students) assert that, for cases of coerced speech, the two-part *Spence* test was abrogated by *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557 (1995) (holding Massachusetts public accommodation law unconstitutional as applied to require private organizers of St. Patrick's Day parade to include gay, lesbian, and bisexual group as its own parade unit). They rely on the Court's statement that "a

39

narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll". *Id.* at 569 (citation omitted).

Of course, where speech is *pure*, a particularized message has never been required; pure speech is entitled to "comprehensive protection under the First Amendment". *Tinker v. Des Moines Indep. Com. Sch. Dist.*, 393 U.S. 503, 505-06 (1969). The *Spence* test, on the other hand, was established to address speech that is less than pure: namely, "expression of an idea through activity". *Spence*, 418 U.S. at 411.

That wearing a school uniform is not pure speech is supported by *Tinker*, which involved students being suspended for wearing black armbands to school to protest the conflict in Vietnam. In distinguishing the armband-suspension from other clothing-related regulations, the Court explained: "The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment.... Our problem involves direct, primary First Amendment rights akin to 'pure speech'". *Tinker*, 393 U.S. at 507-08. Accordingly, for determining what — if any — expressive content there is in wearing

40

the school uniform at issue, we must follow *Canady's* instruction and engage in the two-part *Spence* analysis.

While the Students have proffered some evidence that the Forney Independent School District (FISD) intended to convey a message in adopting the uniform policy — namely, pride in and respect for the values of FISD and its schools — I question whether such a message is sufficiently particularized as to satisfy *Spence*. But, even if FISD did intend that message, I doubt there is any likelihood whatsoever, no less the "great likelihood" required by *Spence*, that such a message would be understood by anyone who happens to see students' blue or khaki trousers (or skirt) and solid-colored shirt. When worn in the factual context and environment in which students are required to wear the uniform — that is, school — the uniform conveys at most the following message: that the wearer is a student.

Accordingly I would hold that, as a matter of law, the wearing of a school uniform devoid of any logo, symbol, or motto — like the wearing of long hair that was at issue in this court's *en banc* decision in *Karr v. Schmidt*, 460 F.2d 609 (5th Cir. 1972)(en banc), *cert. denied*, 409 U.S. 989 (1972) — does not involve "sufficient communicative content" to qualify as expression for First Amendment purposes. Consequently, the requirement to wear such a uniform cannot constitute coerced speech. As the Supreme Court implied in *Hurley*, where the disfavored message is "difficult to identify",

41

there is no risk that the allegedly coerced party is forced "to propound a particular point of view".  *Hurley*, 515 U.S. at 574-75.

2.

Of course, deciding that the wearing of such a school uniform is not expressive conduct alleviates the need to examine the coercion claim under the four-part *O'Brien* test regarding content-neutral restrictions on expressive conduct.  *See United States v. O'Brien*, 391 U.S. 367, 377 (1968).  Indeed, I question whether *O'Brien* applies to school uniform cases.  *See, e.g., Phoenix Elementary Sch. Dist. No. 1 v. Green*, 943 P.2d 836 (Ariz. Ct. App. 1997) (school uniform policy is a content-neutral regulation of the medium, not the message; accordingly, nonpublic forum analysis is the appropriate test); *see also Canady*, 240 F.3d at 443 (noting the similarity of *O'Brien* to traditional time, place, manner analysis).  But that question is best left for another day.  Because coercion to wear the uniform at issue is not coercion to speak, there is no need to apply any degree of heightened scrutiny.

B.

My conclusion that the wearing of the school uniform at issue is not expressive does not, of course, dictate a result with regard to the Students' other First Amendment claim:  restraint on free expression.  For even if the uniform is not imbued with expressive value, the uniform policy still precludes the Students from wearing clothing of their choice that may be expressive.

42

In addressing this second claim, the majority again follows the lead of the *Canady* court in *assuming* that the uniform policy implicates expressive clothing choices. Accordingly, the majority proceeds with the *O'Brien* analysis.

Although "certain choices of clothing may have sufficient communicative content to qualify as First Amendment activity", *Canady*, 240 F.3d at 441 n.3, the present record contains only vague depictions of messages the Students supposedly intend to convey through clothing choice. The deposition testimony of one Student is typical:

> I mean, I don't like them [school uniforms].
> I don't like that we have to wear the same
> thing every day. It's a routine that I don't
> like to be in. I don't like to be told what
> to wear. I would rather wear something that
> expresses who I am.

Arguably, the various "messages" proffered by Students in their depositions may be loosely grouped around the concept of individuality. But, I cannot agree — nor will I assume — that such a message satisfies the two-part *Spence* test for discerning expressive conduct. Because the Students have failed to articulate a particularized message likely to be understood by anyone, I would not examine their free expression challenge under the *O'Brien* test as the majority does. Nor would I apply any degree of heightened scrutiny. Instead, I would ask simply "whether the regulation is reasonably intended to accomplish a constitutionally permissible state objective". *Karr*, 460 F.2d at 616. I conclude it is.

43

III.

"[T]he [Supreme] Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, *consistent with fundamental constitutional safeguards*, to prescribe and control conduct in the schools". ***Tinker***, 393 U.S. at 507 (emphasis added).  In accordance with state law, and in response to a perceived need, FISD has prescribed and controlled the wearing of uniforms in its schools through a uniform policy that is consistent with fundamental constitutional safeguards.  We should address this issue head-on.