JESUIT COLLEGE PREPARATORY
SCHOOL and William Sladek,
Plaintiffs,

v.

Kenneth JUDY, Chairman, Executive Committee of the University Interscholastic League, and William D. Farney, Director of the University Scholastic League, Defendants.

No. CIV.A.3:00–CV–2563–L.

United States District Court,
N.D. Texas,
Dallas Division.

Jan. 24, 2002.

James B. Harris, Stephen Fred Fink, Frank Finn, Stephen Charles Schoettmer, Christopher L. Barnes, L.L.P., Dallas, TX, for Plaintiffs.

James Carlton Todd, Kathlyn C. Wilson, Attorney General of Texas, General Litigation Division, Austin, TX, for Defendants.

### AMENDED MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

On January 22, 2002, the court issued a memorandum opinion and order in this case. Pursuant to Fed.R.Civ.P. 60(a), the court issues this Amended Memorandum Opinion and Order to correct three typographical errors contained in the original opinion. Specifically, on page 15 of the original opinion near the bottom of the page, the text reads as follows: "That a private school may be considered a less attractive alternative because of state action does mean that the state action runs afoul of the United States Constitution when no fundamental right of Plaintiffs is interfered with, struck at, or affected." The word "not" should have been inserted between the words "does" and "mean." The amended opinion corrects this typographical error so that the opinion now reads as the court originally intended. In addition, on page 16 of the opinion, the heading under subparagraph 4 reads "Equal Protection." The court intended for the heading to read "Plaintiffs' Equal Protection Claim." Lastly, on page 20 of the opinion, in citing the statutory provision of the Texas Religious Freedom Restoration Act, the court inadvertently omitted a period after the phrase "*et seq.*" None of these edits changes the substance of the opinion issued on January 22, 2002; the edits are made solely to reflect what the court originally intended. Accordingly, the Memorandum Opinion and Order issued on January 22, 2002, is hereby **vacated** and the following Amended Memorandum Opinion and Order is **substituted** in its place.

Before the court are the following:

1. Defendants' Motion, with Brief, to Dismiss, filed December 12, 2000;

2. Plaintiffs' Response to Defendants' Motion to Dismiss, filed January 9, 2001;

3. Defendants' Reply in Support of Motion to Dismiss, filed January 25, 2001;

4. Plaintiff's Further Response to Defendants' Motion to Dismiss, filed February 20, 2001;

5. Defendants' Reply to Plaintiffs' Further Response, filed February 26, 2001;

6. Letter from Mr. James B. Harris, lead counsel for Plaintiffs, dated April 17, 2001, and directing the court to the case of *Women's Medical Ctr. of Northwest Houston v. Bell*, 248 F.3d 411 (5th Cir.2001);

7. Letter from Mr. James C. Todd, former lead counsel for Defendants, dated April 25, 2001 and also directing the court's attention to the *Women's Medical Ctr.* case;

8. Letter from Ms. Kathlyn C. Wilson, lead counsel for Defendants, dated November 14, 2001, and directing the court's attention to the case of *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275 (5th Cir.2001);

9. Plaintiffs' Motion for Preliminary Injunction and Consolidation of Hearing with Trial on the Merits, and Brief in Support of Request for Preliminary Injunction and Consolidation of Hearing with Trial on the Merits, both filed September 10, 2001;

10. Defendants' Brief in Opposition to Preliminary Injunction and Objection to Consolidate with Trial on the Merits, filed September 27, 2001;

11. Plaintiffs' Reply to Defendants' Opposition to Preliminary Injunction, filed October 12, 2001; and

12. Unopposed Motion and Brief to Confirm Consideration of Preliminary Injunction Briefing in Deciding Motion to Dismiss, filed November 6, 2001.

After careful consideration of the motions, responses, replies and applicable authority, the court **grants** Defendants' Motion to Dismiss; **denies** the parties' Unopposed Motion and Brief to Confirm Consideration of Preliminary Injunction Briefing in Deciding Motion to Dismiss; and **denies** Plaintiffs' Motion for Preliminary Injunction and Consolidation of Hearing with Trial on the Merits.

## I. *Procedural and Factual Background*

Jesuit College Preparatory School and Charles Gonzalez, who was later replaced as a plaintiff by William Sladek ("Plaintiffs" collectively, or "Jesuit" and "Sladek" individually), filed this action pursuant to 42 U.S.C. § 1983 on November 22, 2000, against Defendants, the University Interscholastic League ("UIL"), Larry Butler ("Butler"), and William L. Farney ("Farney").[1] Plaintiffs contend that the exclusion of private schools from the UIL violates the First and Fourteenth Amendments to the United States Constitution and the Texas Religious Freedom Restoration Act, Tex. Civ. Prac. & Rem.Code § 110.001 *et seq.* (Vernon Supp.2002). They seek declaratory and injunctive re-

---

**1.** Plaintiffs filed their First Amended Original Complaint on November 30, 2000, which added Kenneth Judy ("Judy") as a defendant in place of Butler. The court, on motion of Plaintiffs, dismissed the UIL without prejudice from this action on March 28, 2001. On September 18, 2001, the court permitted Plaintiffs to file their Second Amended Original Complaint, which was unopposed. In the Second Amended Original Complaint, Sladek intervened as a party. The amendment effectively substituted Sladek in place of Gonzalez and reflects that the claims against the UIL have been voluntarily dismissed without prej-

udice. In all other respects, the Second Amended Original Complaint is identical to the First Amended Original Complaint. *See* Unopposed Motions and Briefs for Leave to File the Second Amended Complaint and for William Sladek to Intervene at 1. Accordingly, the court, even though Defendants' Motion to Dismiss was filed prior to Plaintiffs' Second Amended Original Complaint, considers and applies the motion to dismiss as if it were filed after the filing of Plaintiffs' Second Amended Original Complaint ("Complaint") because it addressed all claims asserted by Plaintiffs therein.

lief to require the UIL to admit Jesuit as a member.

In particular, Plaintiffs contend that the ban on private schools is motivated by a discriminatory animus, improperly infringes on a fundamental right, and sets up a classification that is unreasonable and motivated by false or wholly speculative differences between public and private schools. Plaintiffs also contend that the ban impairs the rights of Jesuit and the parents of Jesuit students, current and prospective, under the Texas Religious Freedom Restoration Act by burdening the school's and the parents' free exercise of religion without furthering a compelling governmental interest in the least restrictive manner possible.

Judy and Farney contend that the challenged rule is rationally related to legitimate public educational interests; that it does not burden the free exercise of religion or infringe any constitutional rights, fundamental or otherwise; that Jesuit lacks standing; and that the claims against the UIL are barred by Eleventh Amendment immunity. Defendants have filed a motion to dismiss, asserting each of these arguments as a basis for dismissal.[2]

The court now sets forth the facts relevant to its disposition of Defendants' Motion to Dismiss. The facts set forth herein are based upon those that have been well-pleaded in the Complaint, and are accepted as true insofar as consideration of the motion to dismiss.

Plaintiff Jesuit is a Texas not-for-profit corporation that owns and operates an all-male, private, college-preparatory school, located in Dallas, Texas. Approximately 960 students attend the school. The Society of Jesus, or the Jesuit Order, owns the school. The Society of Jesus is a religious order of the Roman Catholic Church. Dallas is within the Order's New Orleans Province. Education is a key mission of the Jesuit Order. Jesuits believe that education enables persons to better serve God and their neighbors, and they use education to advance their religious beliefs.

Sladek is a parent of a junior student at Jesuit. He and his son are Roman Catholic, and his son participates in swimming and other extracurricular activities.

The UIL organizes and runs extracurricular activities of public schools in the state of Texas. An unincorporated associ-

---

**2.** The court is not satisfied that Eleventh Amendment immunity applies because the lack of necessary facts in the record does not permit it to determine whether such immunity exists to show that the UIL is an arm of the state as Defendants contend. To properly conduct an arm-of-state analysis, a court must do a careful examination of the particular entity in question. *McDonald v. Board of Miss. Levee Comm'rs*, 832 F.2d 901, 908 (5th Cir.1987). This careful examination requires consideration of a number of factors, which must include: (1) whether the state statutes and case law view the entity (UIL) as an arm of the state; (2) the source of the entity's funding; (3) the UIL's degree of local autonomy; (4) whether the UIL is concerned primarily with local, as opposed to statewide, problems; (5) whether the UIL has the authority to sue and be sued in its own name; and (6) whether it has the right to hold and

use property. *Southwestern Bell Tel. Co. v. City of El Paso*, 243 F.3d 936, 938 (5th Cir. 2001) (citing *Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir.1986)). The court, however, finds it unnecessary to address Defendants' arguments regarding Eleventh Amendment immunity as the UIL is no longer a party to this action and prospective injunctive relief can be entered against Judy and Farney in their official capacities. The court also notes that the parties have provided esoteric and erudite briefing on the issue of standing. Likewise, the court finds it unnecessary to decide the pesky issue of whether Jesuit has standing to assert the rights of third persons because Sladek, one of the Plaintiffs, certainly has standing to litigate the claims raised in the Complaint. *See Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 50 L.Ed.2d 450.

ation, it is part of the University of Texas at Austin. Its members are primarily public school districts in the state of Texas, and its director is an employee of the University of Texas at Austin. Judy is the chairman of the Executive Committee of the UIL, which interprets and enforces the constitution and contest rules of the UIL. Farney is the director of the UIL.

The Society of Jesus founded Jesuit in 1942. The school educates young men in the Jesuit Order tradition. The foundation of Jesuit's mission is service to the Catholic Church, and, by policy, at least 75 percent of its student body must be of the Catholic faith. Jesuit is committed to the physical, emotional, social, intellectual, and religious developments of its students. Jesuit emphasizes academic excellence and intellectual challenge, introduces students to the various fields of human knowledge, teaches them to learn for themselves, encourages them to think critically, and demands that they learn to make informed, responsible decisions and to accept the

consequences of those decision. Students at Jesuit must perform 100 hours of community service as a condition of graduating. Complaint ¶ 9.

Under Texas law, the UIL is part of the University of Texas at Austin. The UIL makes its own rules, with its legislative council considering proposals for new rules, and, as of September 2, 1999, the Texas Commissioner of Education approving or rejecting, but not modifying, new rules. The UIL's executive committee enforces the rules, and the Commissioner of Education selects the committee's nine members. The President of the University of Texas at Austin selects the UIL's director, who is a University employee. The University also provides the UIL with staff support.[3]

Private schools participated in the UIL's predecessor organizations and in the UIL itself until 1918. In that year, the UIL excluded private schools. The constitution and contest rules of the UIL currently

**3.** While the court accepts Plaintiffs' allegations as true, as it required to accept all well-pleaded facts, it takes judicial notice of the following facts so that one has the complete context in which the UIL operates:

The UIL is a voluntary nonprofit association of Texas public schools, which serves as the statewide organization for inter-school competition in academics, music, and athletics. It was created by the University of Texas at Austin in 1909 and was operated from the Division of Continuing Education for many years. Legislation was adopted in 1984 recognizing it as a part of the University of Texas at Austin. . . .

The UIL Constitution provides that its director is a university employee appointed by the university president. Public school districts and open enrollment charter schools are eligible for membership in the UIL. School districts that belong to the UIL must "comply with applicable state law, Texas Education Agency regulations and the terms of participation in League contests as set out in the Constitution and Contest Rules."

The rules of the UIL are adopted by its legislative council, a twenty-eight member body consisting of twenty school administrators elected by the superintendents of the participant school districts and eight members appointed for four year terms by the chair of the legislative council. Thus, UIL rules are made by a council that represents member school districts. The Education Code requires that rules and procedures of an organization conducting interscholastic competition be consistent with State Board of Education rules and that the UIL submit its rules and procedures to the State Board of Education for approval, disapproval, or modification. A statutorily established advisory council is required to review the rules of the UIL and make recommendations regarding them to the governor, the legislature, the legislative council of the UIL and the State Board of Education. If any provision of the UIL Constitution or rules is inconsistent with state law, the state law prevails.

Op. Tex. Att'y Gen. No. DM–446 at 1 (1997).

provide that only public school districts, public schools, and charter schools are allowed to be members of the UIL.

Jesuit has submitted several requests to join the UIL, or to permit it to participate in UIL activities, but admission has been refused. Jesuit's latest request was April 26, 2000.

Jesuit previously belonged to a league which ceased operations at the end of the 1999–2000 school year. This league consisted of four private schools. Jesuit's applications for membership in the Texas Association of Private and Parochial Schools ("TAPPS") and the Southwestern Preparatory Conference ("SPC") have been rejected because of its size. Jesuit has almost twice the number of students of any TAPPS school and almost three times as many students as the largest SPC school. According to Jesuit, there is no other league for it to try to join.

In advancing its position that it should be allowed to participate in UIL activities or become a part of the UIL, Jesuit contends the following:

17. [Its] participation in the UIL is consistent with [the] UIL's constitutional goals of enhancing students' educational experiences and preparing them for citizenship through interschool competition. Jesuit's participation will enrich the competitive experience for the UIL's current students as well as for Jesuit's students. Moreover, Jesuit's participation will better reflect the reality of adult life and citizenship by eliminating the artificial distinctions between students at public [schools] and students at private schools currently maintained by the UIL's exclusion of private schools.

18. The UIL's refusal to admit Jesuit burdens Jesuit and the parents who send their children to Jesuit. Without membership in the UIL, Jesuit is not able to provide its students with the type of educational and extracurricular programs (such as athletics, music, speech, debate, and drama) offered by all other schools in Texas, public and private. Jesuit is forced to try to build competition schedules in extracurricular activities with other schools who will voluntarily agree to compete with Jesuit on non-UIL time. Those efforts are costly and do not produce consistent schedules or ones that include competing for a meaningful ranking or championship. Jesuit's patchwork schedule also typically requires extra travel time and expense compared with a schedule in the UIL. Only the UIL provides the range of activities, level and quality of competition, and structured contests necessary for a private school of Jesuit's size. Because the school is unable to provide the same educational experience that exists for all other schools in Texas, Jesuit's reputation and attractiveness as an institution are harmed. The UIL's private-school ban also interferes with the rights of parents to choose the school they want their children to attend, by requiring them to accept for their child a less-than-complete extracurricular program if they with to select Jesuit.

Complaint ¶¶ 17–18, at 6–7.[4]

With respect to its assertion of a fundamental right of a parent to guide his or her child's education, Plaintiffs contend as follows:

---

**4.** The court by no means considers the list by Plaintiffs to be a complete list of extracurricular programs or activities. To the court, extracurricular activities would include compe-

tition in academics, as well as cheerleading, and other competitive activities sponsored by a school.

22. Parents have a fundamental right to guide their children's education. They have a right to have their children taught in a language of their choice, to educate their children in private school (including the right to be free from excessive state interference in the selection of private-school teachers and courses), or even to educate their children at home. The right to rear and educate children is a fundamental liberty interest under the Fourteenth Amendment, a privacy interest, and is associated with the rights protected by the First Amendment.

23. As alleged in Paragraph 18, Jesuit's extracurricular programs do not and cannot, without UIL membership, have the same range, strength, structure, or incentives as those programs available to other students in the state, at both public and private schools. Moreover, the UIL's ban is intentionally discriminatory. Thus, the UIL's ban on Jesuit and other private schools intentionally interferes with parents' rights to choose the school they want their children to attend.

Complaint ¶¶ 22–23, at 17–18.

Finally, with respect to their equal protection claim, Plaintiffs contend as follows:

26. UIL's ban on private schools denies Jesuit and the parents of its students, current and prospective, the equal protection of the laws guaranteed by the Fourteenth Amendment.

27. Through the UIL, the state of Texas offers a comprehensive extracurricular program. But it also set up a classification, in excluding private high schools, that is unreasonable and motivated by false or wholly speculative differences between public and private schools. All of the potential recruiting problems supposedly solved by the ban on private schools already exist in the UIL:

a. Any Texas school district can accept into its program of instruction any student it wants, whether or not the student's parents reside within the school's geographic boundaries;

b. Public charter schools are members of UIL and are just like private schools, under UIL rules with respect to attendance zones;

c. Texas law allows students to move away from low-performing schools; and

d. Many major metropolitan public school districts in Texas allow students to move to the high school of their choice.

28. The UIL's ban on private schools is under inclusive because it excludes private schools while allowing public schools that present the same potential recruiting problems to be members.

29. UIL's ban on private-school members irrationally and impermissibly presumes that private schools have already illegally recruited their students or would illegally recruit in the future if allowed to join the UIL. The UIL's ban on private school's is under inclusive because it excludes private schools while allowing public schools that present the same potential recruiting problems to be members.

30. Lastly, the UIL's ban on private schools is intentionally discriminatory as discussed in Paragraphs 11 and 23, and, thus, is not justified by a legitimate or rational state interest, as required to survive even minimal equal-protection scrutiny.

Complaint ¶¶ 26–30 at 8–9. The facts as stated herein and Plaintiffs' contentions, along with the applicable law, serve as bases for the court's analysis and disposition of the motion to dismiss.

## II. *Motion to Dismiss—12(b)(6) Failure to State a Claim*

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 247 (5th Cir.1997). A district court cannot dismiss a complaint, or any part of it, for failure to state a claim upon which relief can be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995). In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir. 1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.; Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid cause of action when it is viewed in the light most favorable to the plaintiff and with every doubt resolved in favor of the plaintiff. *Lowrey,* 117 F.3d at 247. A plaintiff, however, must plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of La-Place,* 954 F.2d 278, 281 (5th Cir.1992).

## III. *Analysis*

### A. Plaintiffs' Federal Claims

### 1. Introduction

Count 1 of Plaintiffs' Complaint asserts a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[5] In particular, Plaintiffs assert a fundamental right for one to educate his or her child at a private school. In Count 2 of the Complaint, Plaintiffs assert a claim under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[6] Plaintiffs contend that the UIL ban infringes upon the fundamental right to educate one's child at a private school and sets up an impermissible classification between private and public schools. Plaintiffs' contend that, since a fundamental right is implicated, the court must apply the strict scrutiny standard of review to their equal protection claim. Defendants disagree, contend that no fundamental right is involved, and urge the court to apply the rational-basis standard of review.

### 2. Strict Scrutiny and Rational-basis Standards of Review

Plaintiffs assert a fundamental right to educate one's child at a private school and contends that the UIL exclusion infringes upon this right and sets up an impermissible classification between private and public schools in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). An Equal Protection inquiry is necessary only if the state action in question "classifies or distinguishes between two or more relevant groups." *Qutb v. Strauss,* 11 F.3d 488, 492 (5th Cir.1993), *cert. denied,* 511 U.S. 1127, 114 S.Ct. 2134, 128 L.Ed.2d 864 (1994). Under an Equal

---

**5.** The Due Process Clause provides that "[n]o State shall ... deprive any person of life, liberty, or prosperity, without due process of law...." U.S. Const. amend XIV, § 1.

**6.** The Equal Protection Clause provides that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Protection analysis, a court applies different standards of review, and such review is predicated on the right or classification in question. *Id.*

The most exacting kind of analysis is that of strict scrutiny, and that standard, as reiterated recently by the Fifth Circuit, is as follows:

> If a classification disadvantages a "suspect class" or impinges upon a "fundamental right," the ordinance [or rule] is subject to strict scrutiny. Under the strict scrutiny standard, we accord the classification no presumption of constitutionality. Instead, we ask whether the classification promotes a compelling governmental interest and, if so, whether the ordinance [rule] is narrowly tailored such that there are no less restrictive means available to effectuate the desired end.

*Qutb v. Strauss,* 11 F.3d at 492. (citations omitted). Distinctions or classifications based on alienage, national origin, or race are suspect categories and subject to strict scrutiny. *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A right is considered fundamental if it "has its source, explicitly or implicitly," in the Constitution. *Plyler v. Doe,* 457 U.S. at 217 n. 15, 102 S.Ct. 2382.

Under the rational-basis analysis, the legislation or official action "is presumed to be valid and will be sustained if the classification drawn by the statute [or official action] is rationally related to a legitimate state interest." *Cleburne v. Cleburne Living Ctr.,* 473 U.S. at 440, 105 S.Ct. 3249. Under the rational basis test, the legislative body or official decisionmaker that establishes the classification or category need not "actually articulate at any time the purpose or rationale supporting its classification." *Nordlinger v. Hahn,* 505 U.S. 1, 15, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). "Instead, a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe,* 509 U.S. 312, 320, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)(internal quotation marks and citations omitted). The state has no obligation "to produce evidence to sustain the rationality of a statutory classification." *Id.* A rule or statute which sets up a classification "is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Under rational-basis review, a court is required to "accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Id.* at 521, 113 S.Ct. 2096. (internal quotation marks and citations omitted). In sum, a classification will be upheld if there is a rational relationship for the difference of treatment between the groups, and some legitimate state interest is served.

### 3. Plaintiffs' Due Process Claim

██ Plaintiffs assert a fundamental right under the Due Process Clause of the Fourteenth Amendment to the United States Constitution for parents to educate their children at a private school. The assertion of this right is based upon the concept that parents have a recognized fundamental right to direct the upbringing and education of their children. *See Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). A substantive due process analysis must commence with

a careful description of the right asserted by Plaintiffs. *See Reno v. Flores,* 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993). To determine the nature of the right asserted by Plaintiffs, the court must carefully examine the allegations of Plaintiffs' Complaint. Although couched in terms of a parent's right to educate his or her child privately, the real "right" being asserted is the "right of students" at private schools to participate in extracurricular activities with public schools. Indeed, the reason that this lawsuit exists is because the students of Jesuit cannot join the UIL and thereby participate in extracurricular activities. Jesuit desires to become a member of the UIL for this express purpose. That technical buzzwords and phrases or legal legerdemain is used does nothing to transform or elevate a desire or want of parents and students to the status of a fundamental right. Review of Plaintiffs' Complaint reveals that indeed no student has been deprived of the right to be educated at a private school. What it does reveal is that students at private schools cannot participate in UIL activities because a UIL ban excludes their participation.

■ The court accepts the premise that a parent has a general fundamental right to direct and control the education and upbringing of his or her child. This concept appears to have been reaffirmed in *Troxel v. Granville,* 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000)("[I]t cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental rights of parents to make decisions concerning the care, custody, and control of their children."). The court, of course, has no quarrel with this reaffirmation; however, recognizing or identifying a right is a far cry from defining and setting the parameters of that right. For example, the parental right identified by the Supreme Court to direct and control the upbringing of a child or the

education of a child is by no means absolute. *See Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275, 291 (5th Cir.2001). As the Fifth Circuit observed well before it decided *Littlefield:*

> [D]ecisions by the Supreme Court declaring that parents have no constitutional right to educate their children in private segregated academies, *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), or to demand approval before the administration of corporal punishment in school, *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711( 1977), or to exercise an absolute veto power over a minor child's decision to terminate a pregnancy via abortion, *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), clearly signal that parental authority falls short of being constitutionally absolute. Confronted with these situations which, at first blush, appear to rest at the heart of parental decision making, the Supreme Court refrained from clothing parental judgment with a constitutional mantle.

*Kite v. Marshall,* 661 F.2d 1027, 1029 (5th Cir.1981), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982). In *Kite,* the court expressly held that parents had no fundamental right to send their children to summer athletics camps and that children had no fundamental right to attend such activities. *Id.*

■ By asserting that extracurricular activities are part of the educational process, Plaintiffs contend that this denies a parent of the fundamental right to educate his or her child privately if that parent decides to choose Jesuit, because the ban "requires Jesuit parents to accept for their child a less-than-complete extracurricular program if they wish to select Jesuit." Plaintiffs' Complaint ¶ 18. While a parent

has a fundamental right to educate his or her child privately, this right applies to the educational process as a whole, not to some separate component or part of the process, such as participation in interscholastic activities. *See Nevares v. San Marcos Consol. Indep. Sch. Dist.,* 111 F.3d 25, 27 (5th Cir.1997)(citing *Walsh v. Louisiana High Sch. Athletic Ass'n,* 616 F.2d 152 (5th Cir.1980)). A student's interest in participating in interscholastic athletics or any other extracurricular activities "amounts to a mere expectation rather than a constitutionally protected claim of entitlement." *Walsh,* 616 F.2d at 159; *see also Hardy v. University Interscholastic League,* 759 F.2d 1233, 1234 (5th Cir.1985)("Participation in interscholastic athletics is not an 'interest' protected by the Due Process Clause.")(citing *Niles v. University Interscholastic League,* 715 F.2d 1027, 1031 (5th Cir.1983), *cert. denied,* 465 U.S. 1028, 104 S.Ct. 1289, 79 L.Ed.2d 691 (1984). Plaintiffs refer to this line of authority as "unremarkable"; however, the court finds the authority to be on point for the real issue raised by Plaintiffs. Moreover, Plaintiffs have cited no relevant or controlling authority which undermines these cases or holds that a student has a fundamental right to participate in any kind of extracurricular activities, and the court has found no such authority.

That a parent has a fundamental right to direct the upbringing and education of his or her child allows the parent the freedom of choice to educate the child at a private school. Living in society is all about making choices and decisions. All choices have consequences, but before making any choice or decision, one has the opportunity to consider and weigh those consequences. This is precisely what happens when one makes a conscious choice to educate his or her child in private school rather than public school, or vice versa. To some parents, private schools have distinct advantages over public schools. For

those reasons, they go the private route. On the other hand, to some parents, public schools have distinct advantages. Indeed, for their own reasons, some persons elect to home school their children rather than attend public or private schools. Stated another way, because of what public schools offer as part of the educational process, including extracurricular activities, they may seem less attractive to some parents. Likewise, some parents may consider private schools less attractive because of what they offer as part of the educational process, including extracurricular activities. Whatever decision a parent makes necessarily involves tradeoffs, and these trade-offs should be weighed before these kinds of choices are made. That a private school may be considered a less attractive alternative because of state action does not mean that the state action runs afoul of the United States Constitution when no fundamental right of Plaintiffs is interfered with, struck at, or affected. The ban does not strike at, interfere with, or affect any of Plaintiffs' fundamental rights. The liberty interest protected is the right to make a fundamental decision to choose between private or public school, not to dictate, control or direct every component of the educational process.

Plaintiffs cannot carve out a component of the educational process, cloak it with the trappings of a fundamental right and then elevate that component to the status of a fundamental right. The fundamental right to educate one's children privately simply does not carry with it the right to control or direct every component of the educational process.

In determining whether a fundamental right is involved in this case, the court finds *Littlefield v. Forney Indep. Sch. Dist.,* 268 F.3d 275 (5th Cir.2001) informative and controlling because it discusses

the ramifications of the *Troxel* opinion. In deciding whether to apply a strict standard or the rational-basis standard to determine the constitutionality of a school district's mandatory school uniform policy, the Fifth Circuit stated:

> The dispositive question at issue is whether the sweeping statements of *Troxel* regarding the "fundamental" "interest of parents in the care, custody, and control of their children," mandate a strict standard of scrutiny for the Parents' Fourteenth Amendment challenge to the Uniform Policy. We do not read *Troxel* to create a fundamental right for parents to control the clothing their children wear to public schools and, thus, instead follow almost eighty years of precedent analyzing parental rights in the context of public education under a rational-basis standard.

*Id.* at 289. Likewise, this court does not read *Troxel* to create a fundamental right for parents to direct and control each component or decision relating to the educational process, or to require that students at private schools be permitted to participate in UIL activities. Accordingly, no fundamental right is implicated with respect to any right for a student to participate in extracurricular activities. Dismissal of this claim is appropriate because no fundamental right of Jesuit, any parent, or student is affected.

#### 4. Plaintiffs' Equal Protection Claim

As the court has determined that no fundamental right is implicated by Plaintiffs' due process claim, it applies the rational-basis standard of review to Plaintiffs' equal protection claim. Defendants contend that a number of rational bases are conceivable for the UIL's exclusion of private schools from UIL membership. Defendants' basic premise is that "[o]pening the UIL to private schools could create unequal competition among competitors who are not similarly situated. Private schools are not subject to several restrictions that limit the public schools' ability to field winning teams or individual contestants." Defendants' Motion to Dismiss at 10.

Defendants first posit as a conceivable rational basis the inability of a public school to be exclusive, that is, it does not have the freedom to select the students who will attend its school, but is required by law to accept all persons of student age (5–21 years) within the school district's boundaries, and all persons of school age between 3 and 21 years with disabilities. *See* Tex. Educ.Code §§ 25.001, *et seq.*, 29.001, *et seq.* (Vernon Supp.2002). Defendants also reference Tex. Educ.Code § 37.001 *et seq.* (Vernon Supp.2002), which relates to discipline and the student code of conduct in public schools, as a further example of what a public school is subject to while a private school is not bound by this provision. Defendants also point out that public schools cannot provide scholarships, raise tuition or adjust enrollment to gain an advantage with respect to interscholastic competition.

The second basis for the ban, according to Defendants, is a public school's "recruitment" of competitors is limited to that school's "attendance zone," while a private school may draw from throughout the state or nation. Defendants, however, concede that Plaintiffs have addressed this policy concern in their pleadings. Defendants contend Plaintiffs have identified some exceptions to what is otherwise a general rule of geographical restriction for public school recruitment, and perhaps have shown only that the UIL policy is not "the best way," or "even a good way," of accomplishing legitimate state objectives." *See* Defendants' Motion to Dismiss at 11.

Finally, Defendants posit that the third competitive advantage for private schools is that public schools are subject to the "no

pass, no play" rule, *see* Tex. Educ.Code § 33.081(c)(Vernon Supp.2002), while private schools are not. Defendants' concern is not that Jesuit would necessarily lower its high academic standards, but because of the relief Plaintiffs seek, the UIL would be required to include many schools whose standards are not as high as Jesuit's, or schools that would lower their standards to be more competitive with respect to interscholastic competition.

■ Plaintiffs' first responds to Defendants' "unequal competition" argument by asserting that no evidence exists in the record to justify the adoption of the ban. In this regard, Plaintiffs misstate the applicable law. As the court has previously set forth, the state or official decisionmaker need not set forth the purpose or rationale for the classification at the time it is made or produce evidence to support the classification under the rational-basis standard of review.

■ Second, Plaintiffs contend that the "unequal competition" justification has no rational-basis because Jesuit states in its Complaint that it will abide by all UIL rules, as well as the "no pass, no play" rule and therefore has no competitive advantage. This gesture on Jesuit's part, however, does not end the inquiry. Assuming that Jesuit is willing to abide by all UIL rules and the "no pass, no play" rule, such action does not render the "unequal competition" rational meaningless or irrational. Jesuit would still have a competitive advantage for athletics because its student body is all male. Jesuit would have a much larger pool of competitors to choose from in athletics because public schools in Texas cannot exclude persons on the basis of gender. Regardless of how well-intentioned Jesuit is about following UIL rules and the "no pass, no play" rule, Jesuit does not agree to abide by other restrictions placed on public schools by state law. Moreover, nothing in the record indicates

whether Jesuit or any other private school would employ state standards when volunteering to follow the "no pass, no play" rule. In this regard, Jesuit has a competitive advantage that a public school cannot match. The "unequal competition" rule addresses this concern. Moreover, Jesuit assumes that all other private schools would abide by UIL rules and the "no pass, no play" rule. They may or may not; but that Jesuit would is not grounds to hold the ban meaningless or irrational. Defendants, perhaps, view that keeping the ban in place, rather than admitting private schools on a piecemeal basis because of agreements or representations that the schools will abide by all UIL rules and the "no pass, no play" rule, is a more suitable way to accomplish its objective.

Finally, Plaintiffs counter the "attendance zone" argument advanced by Defendants by stating:

> [W]hile public schools must accept all students in their attendance zone, they are not limited to accepting students that live in their attendance zone. In other words, public schools have the ability to recruit from all over the state if they choose to do so and a recruited student can continue to live outside the district. Finally, the UIL rules allow charter schools to participate in extracurricular activities. Charter schools are functionally equivalent to private schools in the sense that they have a much broader attendance zone than is typically associated with a public high school, and are free to admit students from outside of any attendance zone they might develop.

Plaintiffs' Response to Defendants' Motion to Dismiss at 22. Defendants acknowledge, as they must, that Plaintiffs have identified some exceptions to a general rule of geographic restriction for public school recruitment. The court recognizes

that the ban is perhaps not the best way of accomplishing the UIL's objective of reducing or eliminating unfair competition. The question is whether it bears some rational relationship to a legitimate state purpose, not whether some inequality results. In meeting this test, the rule or classification does not, of course, have to be perfect or mathematically precise. A more practical illustration underscores this point. As one former National Football League player and ABC Sports commentator once remarked, on observing a receiver catch a wobbly football pass from the quarterback and score a touchdown, "It may not be pretty, but it gets the job done." The court concludes that the UIL ban of private schools bears enough of a rational relationship to the state's interest in reducing unfair or unequal competition among competitors in extracurricular activities, and more particular in this case, interscholastic athletics. Accordingly, the court finds no equal protection violation.

### B. Plaintiffs' Claim under the Texas Religious Freedom Restoration Act

Plaintiffs contend that the ban on private schools violates the Texas Religious Freedom Restoration Act ("TRFRA"), Tex. Civ. Proc. & Rem.Code § 110.001 *et seq.* (Vernon Supp.2002). The Act provides in pertinent part that "a governmental agency may not substantially burden a person's free exercise of religion," unless the challenged practice "is in furtherance of a compelling state interest" and "is the best restrictive means of furthering that interest." Tex. Civ. Prac. & Rem.Code § 110.003(a), (b). The essence of Plaintiffs' claim is as follows:

> 36. There is no compelling state interest furthered by the burden placed on Jesuit and Sladek, and even if there

were, which there is not, banning private schools from the UIL is not the least restrictive means of furthering any interest that might conceivably exist.

> 37. The UIL's ban on private schools also has a disparate impact on Catholic and other religious schools, parents, and students. The ten largest private schools in Texas are all Catholic. Of the 20 largest private schools in the state, fourteen are Catholic and three others have non-Catholic religious affiliations. There is no compelling state interest that furthers the burden placed on Jesuit and Sladek, and, even if there were, which there is not, banning private schools from the UIL is not the least restrictive means of furthering any interest that might concurrently exist.

Complaint ¶¶ 36–37, at 11. Defendants contend that the ban does not violate the TRFRA and that the allegations of Plaintiffs' Complaint, as a matter of law, do not state a claim under the TRFRA. The court agrees.

The parties acknowledge that no definitive Texas cases exist interpreting the TRFRA and that a court may look to federal law under such circumstances. *See* Defendants' Motion to Dismiss at 3, and Plaintiffs' Response to Defendants' Motion to Dismiss at 24.[7]

██ The appropriate start parting point in the analysis of this claim is to determine the meaning of the phrase "a person's free exercise of religion." In setting the parameters for the free exercise of religion, the Supreme Court has stated:

> The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment

---

7. The court has not found any Texas cases interpreting the TRFRA since the date the

parties submitted their briefs.

obviously excludes all "governmental regulation of religious beliefs as such." The government may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma.

[T]he "exercise of religion" often involves not only belief and profession but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation.

*Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)(emphasis and citations omitted.) A thorough review of Plaintiffs' Complaint necessarily establishes that none of the aforementioned concerns is implicated. The Complaint contains no allegations that the ban interferes with Plaintiffs' right to believe and profess whatever religious doctrine they desire, compels or causes affirmation of a particular religious belief, punishes the expression of religious doctrines Defendants believe to be false, imposes special disabilities on the basis of religious view or religious status, or lends the state's power to one side in a controversy over religious authority or doctrine. Moreover, no allegations assert that the ban prohibits Plaintiffs from performing *any* act associated with the practice of their religious beliefs, or requires them to perform an act repugnant to their religious beliefs. Additionally, no allegations assert

that a private school cannot participate in UIL activities because of the religious belief the school espouses. From the record, the ban applies to *all* private schools, regardless of religious affiliation or philosophy. For these reasons, Plaintiffs have set forth no substantial burden or restriction on the exercise of their religion. If *any* burden exists, which the court seriously doubts, it is no more than *de minimus*. Even if there is a *de minimus* burden on the exercise of Plaintiffs' religion, Plaintiffs' claim fails as a matter of law because the plain and unequivocal language of the statute necessarily requires the government action to be a *substantial* burden on the exercise of a person's religion. Plaintiffs have articulated no set of facts to establish that they would be entitled to relief under this claim. Accordingly, Defendants are entitled to dismissal of Plaintiffs' claim under the TRFRA.[8]

### IV. *Plaintiffs' Motion for Preliminary Injunction*

Plaintiffs move the court for a preliminary injunction and request that the court consolidate the hearing on the preliminary injunction with the trial on the merits. Defendants oppose the motion and relief requested by Plaintiffs. For the reason stated herein, the court **denies** the motion for injunctive relief.

In *Canal Authority of the State of Florida v. Callaway,* 489 F.2d 567 (5th Cir.1974)(en banc), the Fifth Circuit set out the prerequisites for granting preliminary injunctive relief. To obtain the extraordinary relief of a temporary restraining order or preliminary injunction, a plaintiff must establish that (1) there is a substantial likelihood that the plaintiff will

---

**8.** Plaintiffs assert "[t]he right to rear and educate children is a fundamental liberty interest protected by the Fourteenth Amendment, a private interest, and is associated with the rights protected by the First Amendment."

Complaint ¶ 22. To the extent Plaintiffs assert a freedom of religion claim under the First Amendment by this oblique reference, such claim is foreclosed for the same reasons that no TRFRA claim exists.

prevail on the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the defendant; and (4) a preliminary injunction or temporary restraining order will not disserve the public interest. *Id.* at 572–73; *see also Clark v. Prichard,* 812 F.2d 991, 993 (5th Cir.1987). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. *Clark,* 812 F.2d at 993 (citing *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 621 (5th Cir.1985)).

The court has held that Defendants are entitled to dismissal of all claims against them. Since the court grants Defendants' Motion to Dismiss, Plaintiffs necessarily cannot establish that there is a substantial likelihood that they will prevail on the merits, one of the prerequisites for injunctive relief. Accordingly, Plaintiffs' Motion for Preliminary Injunction is **denied.**

### V. *Miscellaneous*

Plaintiffs filed an Unopposed Motion and Brief to Confirm Consideration of Preliminary Injunction Briefing in Deciding Motion to Dismiss on November 6, 2001. In that motion, Plaintiffs state that it appears "self-evident" that the court would consider the preliminary injunction briefing because it would benefit the court in ruling on the motion to dismiss. The motion to dismiss was filed well before the motion in question, and had the court not been dealing with a considerable backlog, the motion to dismiss would have been ruled on well before the filing of the latter motion. In this case, there is no need to consider the briefing materials submitted with the motion for preliminary injunction.

Once a motion is filed, the Local Civil Rules permit a response by the nonmovant and a reply by the movant. *See* Local Rule 7.1. Because of the importance of the issues presented, the court allowed both sides a second round of briefing on the motion to dismiss; thus, each side had a second bite at the apple, and the court deems that more than sufficient. Moreover, the court reviewed the submissions regarding the preliminary injunction, and much of the material is a restatement of arguments already addressed by the parties. Accordingly, the Unopposed Motion and Brief to Confirm Consideration of Preliminary Injunction Briefing in Deciding Motion to Dismiss is **denied.**

Finally, the court did not address in writing certain arguments or issues raised by the parties. This, of course, does not mean that the court did not review or consider the argument or issue. If an argument or issue was not addressed in writing by the court, the court did not believe the matter to be necessary in ruling on the motions in question.

### VI. *Conclusion*

For the reasons stated herein, Plaintiffs can state no set of facts in support of their claims which would entitle them to relief. Plaintiffs have not been deprived of any liberty interest or equal protection of the laws under the Fourteenth Amendment of the United States Constitution, and the UIL ban does not substantially burden the free exercise of Plaintiffs' religion under the Texas Religious Freedom Restoration Act. Defendants' Motion to Dismiss is therefore **granted.** Plaintiffs' Motion for Preliminary Injunction and Consolidation of Hearing with Trial on the Merits is **denied,** and the Unopposed Motion and Brief to Confirm Consideration of Preliminary Injunction Briefing in Deciding Motion to Dismiss is **denied.** This action is dismissed with prejudice against Defendants Judy and Farney. Judgment will

issue by separate document as required by Fed.R.Civ.P. 58.